UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Timothy P. Meegan,

                                              Plaintiff,                                **Report and Recommendation**

                    v.                                                                           16-CV-187V

Nancy A. Berryhill,[1]
Acting Commissioner of Social Security,

                                              Defendant.

## I.    INTRODUCTION

Plaintiff Timothy Meegan ("Meegan") is a veteran who was first diagnosed with multiple sclerosis ("MS") in 1998.  For a number of years after the diagnosis, medication kept Meegan's symptoms under control and allowed him to maintain steady employment.  By 2012, however, Meegan's medication regimen became less effective, and he decided to apply for Social Security Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–434.  After an initial application, a hearing before an Administrative Law Judge ("ALJ"), and a request for Appeals Council review, the Social Security Administration (collectively the "Commissioner") denied Meegan's application for benefits.  Meegan consequently commenced this litigation, seeking to reverse or to vacate the Commissioner's final determination.  The Hon. Lawrence J. Vilardo has referred this case to this Court under 28 U.S.C. § 636(b)(1)(B).  (Dkt. No. 13.)

The parties currently have cross-motions (Dkt. Nos. 12, 18) pending for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure ("FRCP").  The Court has

---

[1] On January 23, 2017, Nancy Berryhill replaced Carolyn Colvin as Acting Commissioner of Social Security.  Per FRCP 25(d), Berryhill automatically substitutes for Colvin as the named defendant in this case.  The Clerk of the Court is directed to amend the caption accordingly.

deemed the motions submitted on papers under FRCP 78(b). Of the various issues that the parties have raised, one issue about medical records has drawn the Court's immediate attention. As explained below, all sides ended the hearing before the ALJ with serious questions about the authenticity and accuracy of medical records obtained from a neurologist whom Meegan visited a few times between 2009 and 2014. Despite everyone's concern about the clinical examination details in these records, no one took any action to clarify the authenticity and accuracy of the records. The ALJ nonetheless proceeded to assign the records great weight when deciding that Meegan was not disabled for purposes of Title II.

Leaving the concern about the neurologist's records unresolved was error. Whatever the Commissioner ultimately wants to do about those records or about Meegan's overall application, something needs to be done to answer definitively the questions that arose about the records at the hearing. For that reason, and as explained below, the Court respectfully recommends granting Meegan's motion in part to vacate the Commissioner's determination and to remand for further proceedings consistent with this writing.

## II.    BACKGROUND

### A. Medical and Factual Background

Meegan alleges disability as of September 21, 2012 in connection with his diagnosis of MS. Meegan was diagnosed with relapsing, remitting MS as far back as 1998, with symptoms of paresthesias on his hands and feet and across his chest, coupled with fatigue. (Certified Administrative Record, Dkt. No. 6, at 258 (hereinafter [258]).) The record contains details of the physical impact that MS has had on Meegan, as documented by Physician Assistant Stacy Ann Michalski ("Michalski"). Meegan treated successfully with the medication Avonex for about eight

years after diagnosis, but the Avonex then stopped working. [289.] Meegan denied symptoms of vertigo as of October 2011. [322.] Michalski examined Meegan on May 1, 2012 and found continued paresthesias on his right thumb, soles of his feet, and across his chest; an accompanying MRI uncovered signs of demyelination. [227–28.] Meegan's reflexes around that time were largely normal. [290.] Records from October 2012 noted neurogenic bladder and some nerve paralysis, to be addressed with intravenous steroids. [249.] Meegan received the medication Tysabri around the same time. [251.] Michalski noted around August 2012 that Meegan suffered an exacerbation a few months earlier that steroids alleviated only partially. [258, 269.] Meegan's chronic symptoms have included hearing loss to the right ear but no loss of vision or double vision. [272.] Meegan admitted to some mild instability, and weakness with walking, around February 2012. [298.] When Meegan saw Michalski on January 31, 2014, he denied any exacerbations but claimed that his muscles fatigued easily. [465.] Meegan reported that the medication Amantadine helped with daytime fatigue. [465.] Meegan denied any mood swings, hallucinations, vision changes, hemiparesis, cognitive impairment, seizures, ataxia, or tremors at that time. [466.] Meegan reported largely the same conditions to Michalski on June 11, 2014, though he did mention that he sometimes dropped objects out of his right hand because of decreased sensation. [563.] On or around July 2, 2014, Michalski wrote a letter apparently for the file and for an unspecified audience. [565.] In the letter, Michalski emphasizes that Meegan has reduced strength and excessive weakness coupled with some blurred vision when watching computer or television screens. [565.] Michalski also noted that Meegan had short-term memory loss, difficulty with mental concentration for short periods of time, and significant upper and lower extremity fatigue.

3

[565.] Michalski concluded that Meegan "has had progressive mental and physical disabilities since his diagnosis." [565.]

Because of Meegan's recurring symptoms, Michalski requested a neurology consultation with Dr. David Hojnacki ("Hojnacki") for a six-month period running from June 12 to December 11, 2012. [263.] Hojnacki also saw Meegan on March 30, 2011, the first time that he had seen Meegan since December 2009. [573, 575.] Hojnacki found Meegan to have normal visual fields, strength, reflexes, and gait. [574.] Hojnacki additionally examined Meegan on January 16, 2014. At the examination, Meegan reported paresthesias and some problems with coordination but no vision loss, double vision, hyperesthesia, fatigue, limb weakness, loss of balance, or related symptoms. [559.] Hojnacki found intact cranial nerves and generally normal reflexes along with a normal gait. [560–61.]

The record also contains the results of a consultative neurologic examination by Dr. Donna Miller ("Miller") on February 12, 2013. Meegan reported activities of daily living such as cleaning, laundry, and daily grooming. [376.] Miller found appropriate affect and no indication of memory impairment. [377.] Meegan presented with full grip strength in his hands and normal reflexes. [377.] Miller assessed Meegan with a stable prognosis and offered the medical source statement that Meegan "should avoid working in unprotected heights given his balance issues, as well as prolonged standing and walking." [378.]

The record contains information about Meegan's mental health as well. In October 2011, Meegan reported adjustment disorder with a depressed mood and some suicidal ideation but also reported that any depression had not interfered with his functioning for any time longer than two

4

weeks. [332.] As of January 2012, Meegan was working as an inside sales manager at a plumbing company and noted mild cognitive impairment when extremely tired. [272.] In October 2012, Meegan was rated with a 70% disability for chronic adjustment disorder. [249.]

Apart from Miller's medical source statement, the record contains one treating source statement from Michalski at the Veterans Administration Neurology Department. [566.] Michalski rated Meegan as fair or poor for a number of mental abilities including remembering and carrying out short and simple instructions; maintaining attention for two-hour segments; working without supervision; and making simple work-related decisions. [566–67.] Michalski rated Meegan with a good ability to ask simple questions; to accept instructions and criticism; to get along with coworkers; and to be aware of normal hazards. [567.]

### B. Procedural Background

#### i. Proceedings before the Agency

Meegan applied for disability insurance benefits on November 29, 2012, claiming an onset date of September 21, 2012. [147.] On February 28, 2013, the Commissioner denied Meegan's initial application and found Meegan not disabled. [94.] On March 7, 2013, Meegan requested a hearing before an ALJ. [108.]

The hearing occurred on June 2, 2014. [36.] At the hearing, Meegan's counsel raised the issue of qualifying under Medical Listing 11.09 for MS. [40.] Meegan proceeded to testify at the hearing. With respect to highlights of his testimony, Meegan testified that he had trouble concentrating on writing that was in front of him but that his vision was otherwise good. [48.] Meegan testified that his hands were "completely numb" and that he had to concentrate on objects to avoid dropping them. [48–49.] Meegan reported constant fatigue that required him to take

5

about one or two naps per day.  [51.]  Meegan reported trouble concentrating for more than 15 minutes at a time.  [52.]  Walking was possible for about 15–30 minutes at a time, but then Meegan would have to rest.  [54.]

Reconciling Hojnacki's medical records with Meegan's testimony became a topic of discussion at the hearing.  Meegan, his counsel, and the ALJ all seemed to agree that Hojnacki's medical records differed significantly from Meegan's testimony.  [59.]  Counsel even suggested that Hojnacki conducted little if any testing to generate his medical records.  [60.]  The ALJ then remarked as follows:

> There's a full cranial nerve exam reported.  Motor strength in all muscle groups was normal.  You know, these are all very specific kinds of exams that a neurologist will go through with a lot of pushing and shoving and questioning going on.  So either that didn't happen and this report is unsubstantiated or it did happen and perhaps the doctor was wrong in his conclusions.  I'm very, very confused by this record.

[61.]  By the end of the discussion, counsel committed to reaching out to Hojnacki for clarification.  [62.]  Counsel also asked for and received permission to keep the record open to address the concerns "that we both have" concerning Hojnacki's medical records.  [69.]  The ALJ added "the caveat that I would give to anybody and it has nothing to do with you in particular, obviously.  A letter from a doctor saying 'Oh, that record was completely wrong' and, you know, isn't of much use.  So, you know, it would have to be a truly explanatory document of some kind." [70.]

The hearing then continued with testimony from a Vocational Expert ("VE").  The ALJ posed the following hypothetical scenario to the VE: "Assuming that person can do sedentary work.  Can use hands for gross and fine manipulation.  Can use feet for foot pedals and controls. But cannot do that more than occasionally in total.  And cannot do that at any one time for

greater than 15 minutes." [77.] The VE responded that several occupations possibly would fit those limitations—call-out operator, surveillance system monitor, and election clerk. [77–79.] Counsel then asked the VE to consider a modified hypothetical in which 30 minutes of focused vision caused eye fatigue and required about an hour of rest from focusing on anything up close. [83–84.] The VE never heard a question like that before but responded that the interruptions in focused viewing probably would eliminate the three occupations that he had identified. [84.]

The administrative record was left open for months after the hearing to allow Meegan a chance to obtain clarification about Hojnacki's medical records. As far as the record seems to indicate, the ALJ did not contact Hojnacki directly. Counsel never followed up on the commitment to obtain a clarification from Hojnacki, even after the ALJ made inquiries to counsel. [218.]

The ALJ issued his decision on May 13, 2015. The ALJ's findings for Step One and Two are not in dispute in this case. At Step Three, the ALJ found that Meegan did not meet Medical Listing 11.09 "because he does not have disorganization of motor function, visual or mental impairment as described under sections related to senses or mental impairment. He does not have significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity." [23.] At Steps Four and Five, the ALJ adopted the hypothetical that he posed to the VE at the hearing along with the VE's answer. [24, 31.] The ALJ took several steps to reach his conclusions. The ALJ effectively discounted Meegan's testimony when he cited Veterans Administration records and found that the "objective medical findings of this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations." [25.] The

ALJ summarized the symptoms that Michalski had found during Meegan's visits to her. [26–28.]
The ALJ summarized also the clinical findings from Miller's records. [26.] After summarizing
Michalski's examinations for three pages, the ALJ noted Hojnacki's findings in one paragraph.
[29.] In his summary of Hojnacki's findings, the ALJ made hardly any mention of the concern
that all sides expressed at the hearing about Hojnacki's records, including the ALJ's conclusion
that "either that [examination] didn't happen and this report is unsubstantiated or it did happen
and perhaps the doctor was wrong in his conclusions." The ALJ noted that he questioned Meegan
about discrepancies between his testimony and Hojnacki's records. [29.] The ALJ noted further
that counsel never submitted the clarification that was promised. [29.] Beyond that, the ALJ
proceeded to "give great weight to examination findings of Dr. Hojnacki." [29.]

On June 24, 2015, Meegan asked the Commissioner's Appeals Council to review the ALJ's
decision. [17.] On January 12, 2016, the Appeals Council denied Meegan's request for review,
establishing exhaustion of administrative remedies at that point. [4.]

ii.    *Proceedings in the District Court*

Meegan commenced this case by filing his complaint on March 3, 2016. (Dkt. No. 1.)
After the Commissioner filed the administrative record, Meegan filed his pending motion on
November 7, 2016. (Dkt. No. 12.) Meegan raises several issues in an attempt to reverse or at least
to vacate the Commissioner's final determination. Meegan argues that the ALJ gave too little
weight to Michalski's numerous examinations and findings in favor of the disputed records from
Hojnacki. With respect to the dispute that arose at the hearing, Meegan argues that the ALJ
should have made an effort to contact Hojnacki directly apart from any promises from counsel. By
failing to make such an effort, according to Meegan, the ALJ wound up relying heavily on records

that he himself concluded had to be either "unsubstantiated" or just plain "wrong."  Meegan

argues further that the ALJ did not evaluate certain records concerning his cognitive limitations

and that the ALJ relied too much on his own lay opinion of raw medical data.  Finally, Meegan

asserts that the wording of the ALJ's Step Four findings does not match the hypothetical that he

posed to the VE and reads to eliminate the occupations that the VE had identified.

The Commissioner filed her cross-motion on February 27, 2017.  (Dkt. No. 18.)  Among

other arguments, the Commissioner defends the ALJ's rejection of any opinion from Michalski as

inconsistent with her own records.  The Commissioner defends the ALJ's reliance on Hojnacki's

records for two reasons.  First, the Commissioner argues that Hojnacki's records reflected clinical

examinations and were largely consistent with Michalski's records as apart from Michalski's

opinions.  Second, the Commissioner acknowledges concern about Hojnacki's records but argues

that counsel did not supplement the record and that the ALJ had no obligation to contact

Hojnacki under the circumstances.

## III.    DISCUSSION

### A.  *Standard of Review Generally*

The ultimate issue to be determined by this Court is whether the ALJ's decision that

Meegan was not under a disability is supported by substantial evidence.  *See* 42 U.S.C. § 405(g);

*Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  Substantial evidence is defined as "'more than

a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co.

v. NLRB*, 305 U.S. 197, 229 (1938)).

9

For purposes of both Social Security Insurance and disability insurance benefits, a person is disabled when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).

Such a disability will be found to exist only if an individual's "physical or mental impairment or impairments are of such severity that [he or she] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. §§ 423(d) (2)(A) & 1382c(a)(3)(B).

Meegan bears the initial burden of showing that his impairments prevent him from returning to his previous type of employment.  *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Once this burden has been met, "the burden shifts to the [Commissioner] to prove the existence of alternative substantial gainful work which exists in the national economy and which the plaintiff could perform."  *Id.*; *see also Dumas v. Schweiker*, 712 F.2d 1545, 1551 (2d Cir. 1983); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

To determine whether any plaintiff is suffering from a disability, the ALJ must employ a five-step inquiry:

(1) whether the plaintiff is currently working;

(2) whether the plaintiff suffers from a severe impairment;

(3) whether the impairment is listed in Appendix 1 of the relevant regulations;

> (4) whether the impairment prevents the plaintiff from continuing his past relevant work; and
>
> (5) whether the impairment prevents the plaintiff from continuing his past relevant work; and whether the impairment prevents the plaintiff from doing any kind of work.

20 C.F.R. §§ 404.1520 & 416.920; *Berry*, *supra*, 675 F.2d at 467. If a plaintiff is found to be either disabled or not disabled at any step in this sequential inquiry, the ALJ's review ends. 20 C.F.R. §§ 404.1520(a) & 416.920(a); *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir.1992). However, the ALJ has an affirmative duty to develop the record. *Gold v. Secretary*, 463 F.2d 38, 43 (2d Cir. 1972).

To determine whether an admitted impairment prevents a plaintiff from performing his past work, the ALJ is required to review the plaintiff's residual functional capacity and the physical and mental demands of the work that he has done in the past. 20 C.F.R. §§ 404.1520(e) & 416.920(e). The ALJ must then determine the individual's ability to return to his past relevant work given his residual functional capacity. *Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir. 1994).

### B. Questions About Hojnacki's Records

Before the Court can proceed any further, it has to decide what to make of the questions surrounding Hojnacki's records. As noted above and in the record, Hojnacki saw Meegan on at least three occasions: December 31, 2009; March 30, 2011; and January 16, 2014. [569–77.] The records from each visit contain details of physical, neurological, motor, and sensory examinations. The records contain objective clinical findings about details such as blood pressure, visual acuity, deep tendon reflexes, and the expanded disability status scale. On their faces—and the Court is

not making a finding to this effect—the records look like ordinary treatment records from a treating physician that might enjoy substantial weight in support of the Commissioner's position.

Yet the treatment of the records took a dramatically different turn at the hearing before the ALJ. Meegan testified that his relationship with Hojnacki "was strictly for medication purposes. That was really the only reason I went to see him." [59.] The ALJ credited Meegan's account; both the ALJ and counsel agreed that the level of clinical detail in Hojnacki's records "doesn't make sense" [59] for office visits limited to medication counseling. The ALJ even went as far as to reach only two possible explanations for the discrepancy: Either the records were "unsubstantiated" [61], meaning charitably that perhaps Hojnacki confused patients or, much less charitably, that Hojnacki just made up the details; or Hojnacki "was wrong in his conclusions" [61], the meaning of which is not quite clear because the records contain no opinions about functional capacity. The ALJ, being "very, very confused by this record" [61], invited counsel to obtain some kind of clarification from Hojnacki about what the relationship with Meegan was or how the clinical findings occurred.

Under these circumstances, the pivot from great confusion to "great weight" [29] is both unexplained and possibly inexplicable. The situation here is not like the more common situation of an ALJ having to sort through treatment providers who disagree with each other. What to do about Michalski's opinions and findings is a separate matter. The problem here is that the ALJ, having placed the entirety of Hojnacki's records in serious doubt, has offered no reason why those same records suddenly should receive controlling weight. *Cf., e.g., Ingrassia v. Colvin*, No. 16-CV-00995 (ADS), 2017 WL 908195, at *17 (E.D.N.Y. Mar. 6, 2017) ("The ALJ said that he afforded

great weight to Dr. Dutta's opinion because it was a 'complete examination.' This is a conclusory statement, and the Court is unsure what it means. The ALJ did not set forth reasons why Dr. Dutta's opinion should be afforded great weight, and that was error.") (citations omitted). If the ALJ has decided that Meegan simply had a faulty memory about the visits to Hojnacki then he should so state, and perhaps that would be one way to resolve the problem. Another way, and perhaps the better way, would be to have the ALJ present Hojnacki with Meegan's testimony and to obtain some kind of clarification about whether the various clinical examinations actually happened. *Cf. Duncan v. Astrue*, No. 09-CV-4462 KAM, 2011 WL 1748549, at *20 (E.D.N.Y. May 6, 2011) ("[I]f an ALJ believes that a treating physician's opinion lacks support or is internally inconsistent, he may not discredit the opinion on this basis but must affirmatively seek out clarifying information from the doctor.") (citations omitted). Meegan's counsel needs to be more helpful to this end; regardless of who has what legal obligations to develop the record, the client's credibility was at stake, and the client's application would have benefited from a clarification. Nonetheless, the ALJ's general obligation to develop the record would not mean much if it did not extend to an obligation to ensure that records accorded great weight were both genuine and accurate. *See, e.g., Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.") (citation omitted); *Devora v. Barnhart*, 205 F. Supp. 2d 164, 172–73 (S.D.N.Y. 2002) ("The ALJ is authorized to issue subpoenas to ensure not only the production of a claimant's medical records, but also to obtain the testimony of necessary witnesses. *See* 42 U.S.C. § 405(d). The duty of the ALJ to develop the record is particularly important when it comes to

obtaining information from a claimant's treating physician."); *see also Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) ("[T]he ALJ, unlike a judge in a trial, must herself affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding. This duty arises from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination, and exists even when, as here, the claimant is represented by counsel.") (internal quotation and editorial marks and citations omitted ); *accord Jones v. Colvin*, No. 11-CV-0999 NAM/VEB, 2013 WL 1337070, at *5 (N.D.N.Y. Mar. 11, 2013), *report and recommendation adopted*, No. 5:11-CV-999 NAM/VEB, 2013 WL 1337309 (N.D.N.Y. Mar. 29, 2013). The Court will leave to the Commissioner and to counsel what method of resolving the concern from the hearing might be best. For now, the Court will say only that a determination of substantial evidence is impossible so long as it cannot have confidence that the most important clinical examinations in the record actually happened.

In recommending a return of this case to the Commissioner, the Court finds that an assessment of the other issues raised by the parties is not necessary now. The Court also places no limits on what a second ALJ determination should be and takes no position at this time on the ultimate merits of Meegan's application.

## IV.   CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting Meegan's motion (Dkt. No. 12) in part, to vacate the Commissioner's final determination and to remand the matter to the Commissioner for further proceedings consistent with this writing. The Court further recommends denying the Commissioner's cross-motion (Dkt. No. 18) in its entirety.

**V.    OBJECTIONS**

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); FRCP 72.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

___/s Hugh B. Scott_____
Hon. Hugh B. Scott
United States Magistrate Judge

DATED: April 5, 2017

15